THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLORIA JEAN CHASE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:16-CV-1724 |
| | : | (JUDGE MARIANI) |
| FRONTIER COMMUNICATIONS | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Defendant Frontier Communications Corporation's Motion for Summary Judgment (Doc. 25) is pending before the Court. With this motion, Defendant requests the Court to dismiss the action in its entirety with prejudice. (*Id.* at 2.) In her two-count Complaint, Plaintiff alleges that Defendant violated the Age Discrimination in Employment Act ("ADEA) and the Pennsylvania Human Relations Act ("PHRA") in that she was terminated because of her age and/or because of age-related complaints lodged to both the trainer, Judy Kunkel, and the hiring manager/site supervisor, Stacy Mason, during her initial training period. (Doc. 1.) For the reasons discussed below, the Court concludes that Defendant is entitled to summary judgment on Plaintiff's age discrimination claims but disputed issues of material fact preclude the entry of summary judgment on Plaintiff's retaliation claims.

1

## II. STATEMENT OF UNDISPUTED FACTS[1]

Plaintiff, whose birth name was Gloria Jean Saporito, was born in 1949. (Def.'s

Statement of Undisputed Material Facts, Doc. 26 ¶¶ 1-2; Pl.'s Answer to Defendant's

Statement of Undisputed Material Facts, Doc. 33-1 ¶¶ 1-2.) In 2015, she applied to work at

Citizens Telecom Services Co. ("CTSI"), commonly referred to as "Frontier." (Doc. 26 ¶ 8;

Doc. 33-1 ¶ 8.) Plaintiff wrote on the application that her full name is "Gloria J. Saporito

Chase" and she signed the application "Gloria Jean Saporito." (Doc. 26 ¶¶ 8, 11; Doc. 33-1

¶¶ 8, 11.) Plaintiff had worked for CTSI from about 2004 to 2007. (Doc. 26 ¶ 6; Doc. 33-1 ¶

6.) Plaintiff used her maiden name on her application because she felt she could use both

names or either name and was seeking a new feeling of independence after separating

from her husband. (Doc. 26 ¶ 10; Doc. 33-1 ¶ 10.)

---

[1]Because Defendant, as the moving party, has the burden of showing that summary judgment is warranted, Fed. R. Civ. P. 56(a), and the Local Rules require the moving party to submit a statement of material facts to which Plaintiff is to respond, M.D. Pa. L.R. 56.1, the Statement of Undisputed Facts set out in the text does not include facts presented in Plaintiff's Counterstatement of Material Facts Precluding the Entry of Summary Judgment (Doc. 33-1 ¶¶ 79-195). However, because Defendant accepts as true statements made therein for purposes of this Motion (Doc. 35 at 7 n.2), relevant facts asserted in Plaintiff's Counterstatement will be considered undisputed in the Discussion section of the Memorandum.

Facts deemed undisputed include those Plaintiff "[d]enied as stated" and those for which she provided a qualified denial where Plaintiff did not controvert Defendant's corresponding factual assertion or otherwise properly support her factual position pursuant to Federal Rule of Civil Procedure 56(c) and/or Local Rule 56.1. Fed. R. Civ. P. 56(e); M.D. Pa. L.R. 56.1. The following paragraphs contain facts deemed undisputed on this basis: 10, 13, 19, 26, 29, 31, 32-35, 38, 41, 42, 45, 46, 50, 53, 56, 57, 59, 61-66.

Defendant provides citation to the record for all statements considered in this section of the Memorandum. (*See* Docs. 26, 33-1.) The Court has verified citations but omits them from the recitation set out in the text.

Stacy Mason was based in Johnstown, New York, and was the Supervisor of the Commercial Contact Center with responsibility for managing a team of work-at-home employees in New York and Pennsylvania. (Doc. 26 ¶ 14; Doc. 33-1 ¶ 14.) After Frontier Recruiting Coordinator, Sarah Gallert, first reached out to Plaintiff at Mason's request to set up a phone interview, Mason conducted the phone interview on February 17, 2015. (Doc. 26 ¶¶ 13-15; Doc. 33-1 ¶¶ 13-15.) During the in-person interview on February 23, 2015, at Defendant's Dallas, Pennsylvania, location, Plaintiff told Mason that she had worked for CTSI under her married name and she was using her maiden name. (Doc. 26 ¶ 17; Doc. 33-1 ¶ 17.) Gallert did not know Plaintiff was a former CTSI employee during the hiring process because she checked Frontier's records under the name Saporito. (Doc. 26 ¶ 19; Doc. 33-1 ¶ 19.)

Plaintiff received an offer of employment via email from Gallert. (Doc. 26 ¶ 21; Doc. 33-1 ¶ 21.) The offer letter attached to the email was addressed to Gloria Jean Saporito. (*Id.*) The offer letter stated as follows:

> Federal law requires that you provide documentation (I-9) confirming your eligibility to work in the United States. A list of documents that you may use to establish our identity and employment eligibility can be found through our electronic on-boarding tool, Red Carpet. Please bring appropriate documents with you when you report to work on your first day.

(Doc. 26 ¶¶ 22-23; Doc. 33-1 ¶¶ 22-23.) Plaintiff understood that providing the documentation was a requirement of the job. (Doc. 26 ¶ 24; Doc. 33-1 ¶ 24.)

Plaintiff accepted the job offer, signing her name "Gloria Jean Saporito." (Doc. 26 ¶ 25; Doc. 33-1 ¶ 25.)

On March 19, 2015, Plaintiff received an email from Gallert reminding her to bring two forms of identification to the first day of training. (Doc. 26 ¶ 26; Doc. 33-1 ¶ 26.) The list of acceptable identification documents was attached to the email. (Doc. 26 ¶ 27; Doc. 33-1 ¶ 27.) Plaintiff understood that the Lists of Acceptable Documents noted that all documents must be unexpired. (Doc. 26 ¶ 28; Doc. 33-1 ¶ 28.) Plaintiff responded to the email, "Thanks I will bring ID." (Doc. 26 ¶ 29; Doc. 33-1 ¶ 29.)

Work-at-home employment with Frontier starts with a five to six week in-person training course. (Doc. 26 ¶ 30; Doc. 33-1 ¶ 30.) Plaintiff's class had twelve employees. (Id.) Plaintiff started work on Monday, March 23, 2015. (Doc. 26 ¶ 31; Doc. 33-1 ¶ 31.) The new-hire trainer, Judy Kunkel, collected everyone's I-9 documentation. (Id.) Plaintiff claims she told Kunkel that everything was under her married name, Gloria Chase, and Kunkel said to "let HR worry about it." (Doc. 26 ¶ 32; Doc. 33-1 ¶ 32.) Plaintiff provided a driver's license which was dated as expired in 2007 and a Social Security Card, both under the name "Gloria Jean Chase." (Doc. 26 ¶¶ 33-34; Doc. 33-1 ¶¶ 33-34.) Kunkel testified that she faxed the new-hire class I-9 documentation to Gallert who was responsible for making sure the documentation for the class was in order. (Doc. 26 ¶ 36; Doc. 33-1 ¶ 36.)

4

Plaintiff provided to Defendant the documents that she felt were legal. (Doc. 26 ¶ 38; Doc. 33-1 ¶ 38.)

On the first day of training, Kunkel distributed a document titled "Course Expectations." (Doc. 26 ¶ 39; Doc. 33-1 ¶ 39.) Plaintiff understood that training attendance was required to be one hundred percent. (Doc. 26 ¶ 40; Doc. 33-1 ¶ 40.)

Early in the training, Kunkel displayed a spreadsheet for the employees in the class to write down their employee ID numbers and took it down a few seconds later when she realized it also contained the employees' birthdates. (Doc. 26 ¶ 41; Doc. 33-1 ¶ 41.)

Plaintiff said that two other new hires, Lisa Webby and Mollie Peeler, began teasing her on the first day of training. (Doc. 26 ¶ 42; Doc. 33-1 ¶ 42.) Webby was born in 1965 and Peeler was born in 1960. (Doc. 26 ¶ 43; Doc. 33-1 ¶ 43.) Peeler believed she was the oldest in the class. (*Id.*) The next day, Tuesday, Plaintiff complained to Kunkel about the comments made by Webby and Peeler. (Doc. 26 ¶ 44; Doc. 33-1 ¶ 44.) Plaintiff said the teasing included comments such as "Are you okay? Are you getting this" Are you learning this?" and "I hope I'm not working at that age." (Doc. 26 ¶ 45; Doc. 33-1 ¶ 45.)

On Wednesday, March 25th, Gallert emailed Kunkel about the I-9 documentation issues with the class. (Doc. 26 ¶ 46; Doc. 33-1 ¶ 46.) She stated that Plaintiff and another employee would be suspended if they did not turn in identification. (*Id.*) Kunkel the told Plaintiff that she received an email from Gallert indicating that Frontier needed more

information with her maiden name, which she had used on her application. (Doc. 26 ¶ 47; Doc. 33-1 ¶ 47.) Plaintiff emailed Gallert her Certificate of Baptism that night. (Doc. 26 ¶ 48; Doc. 33-1 ¶ 48.) Plaintiff acknowledged that a Certificate of Baptism is not an acceptable form of identification. (Doc. 26 ¶ 49; Doc. 33-1 ¶ 49.) Plaintiff did not send Gallert the Voter Registration card or license camera card she had offered to Kunkel, both of which were under the name Gloria Jean Chase. (Doc. 26 ¶¶ 50-51; Doc. 33-1 ¶¶ 50-51.)

On Thursday, March 26th, Plaintiff called Mason before work to complain about the alleged comments made by her co-workers. (Doc. 26 ¶ 52; Doc. 33-1 ¶ 52.) Plaintiff noted that Mason was "very upset" and "shocked" by Plaintiff's complaints. (Doc. 26 ¶ 53; Doc. 33-1 ¶ 53.) After Plaintiff and Mason spoke, Mason called Kunkel and asked her to address the class about basic common courtesy and Kunkel did so. (Doc. 26 ¶ 55; Doc. 33-1 ¶ 55.)

Mason then heard from Gallert that Plaintiff had not produced two forms of identification as required. (Doc. 26 ¶ 56; Doc. 33-1 ¶ 56.) Gallert was not aware of Plaintiff's complaint as to her co-workers' comments on seeing her birthdate as listed on the spreadsheet posted, and Gallert did not discuss terminating Plaintiff with Mason. (Doc. 26 ¶ 57; Doc. 33-1 ¶ 57.)

Mason spoke with Plaintiff again, and Plaintiff indicated she did not know when she would get the required identification documents. (Doc. 26 ¶ 58; Doc. 33-1 ¶ 58.) Mason then spoke with Human Resources Manager, Tracy Owen, about Plaintiff's not having her

documentation in on time and not having an estimate of when it would be available. (Doc. 26 ¶ 59; Doc. 33-1 ¶ 59.) Owen said she made the decision to terminate Plaintiff. (Doc. 26 ¶ 61; Doc. 33-1 ¶ 61.) She took into consideration the one hundred percent attendance policy and Plaintiff's inability to say when she would get valid identification documents. (Doc. 26 ¶ 62; Doc. 33-1 ¶ 62.) Owen was not aware of any other employee in her region who failed to provide the legally-required documentation to accompany their I-9 form. (Doc. 26 ¶ 63; Doc. 33-1 ¶ 63.)

After speaking with Owen, Mason called Kunkel and told her the decision had been made to terminate Plaintiff. (Doc. 26 ¶ 64; Doc. 33-1 ¶ 64.) Plaintiff was terminated on Thursday, March 26, 2015. (Doc. 26 ¶ 65; Doc. 33-1 ¶ 65.)

Plaintiff understood the purpose of the I-9 Form was to verify her identity and eligibility to work in the United States and that Frontier has rules it has to follow. (Doc. 26 ¶ 66; Doc. 33-1 ¶ 66.)

After Plaintiff was terminated, she went home and called to see if she could obtain a birth certificate and called the courthouse to apply for a name change. (Doc. 26 ¶ 67; Doc. 33-1 ¶ 67.) Plaintiff felt it may take time to get the documents needed but if she could prove she could get them she could be permitted to make up training with another employee in her class, Jack Marchese, who had missed class during the first week because of a medical emergency. (Doc. 26 ¶¶ 68-69; Doc. 33-1 ¶¶ 68-69.) Mason permitted Marchese,

7

who had not turned in I-9 documents by the end of the work day on Wednesday, to make up the training time on Saturday. (Doc. 26 ¶ 70; Doc. 33-1 ¶ 70.) Mason made the decision to permit Marchese to make up the training as an accommodation because he missed class due to a medical issue. (Doc. 26 ¶ 71; Doc. 33-1 ¶ 71.) Owen was not aware the Marchese was permitted to make up class until after Plaintiff was terminated. (*Id.*) Marchese was born in 1963. (Doc. 26 ¶ 73; Doc. 33-1 ¶ 73.)

After Plaintiff's termination, Owen spoke to her about the termination and other concerns. (Doc. 26 ¶ 75; Doc. 33-1 ¶ 75.) Owen did not do any additional investigation because she felt what had been done was sufficient. (Doc. 26 ¶ 76; Doc. 33-1 ¶ 76.)

Plaintiff believes Defendant discriminated against her on the basis of her age. (Doc. 26 ¶ 77; Doc. 33-1 ¶ 77.) She also believes she was retaliated against for complaints made to Mason. (Doc. 26 ¶ 78; Doc. 33-1 ¶ 78.)

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no *genuine* issue of *material* fact.
> When opposing parties tell two different stories, one of which is blatantly
> contradicted by the record, so that no reasonable jury could believe it, a court
> should not adopt that version of the facts for purposes of ruling on a motion for
> summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make

credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S.

at 255. Therefore, when evidentiary facts are in dispute, when the credibility of

witnesses may be in issue, or when conflicting evidence must be weighed, a full trial

is usually necessary.

## IV. ANALYSIS

### a. Discrimination on the Basis of Age

Plaintiff contends Defendant discriminated against her because of her age in

violation of ADEA and the PHRA. (Doc. 1 at 8.) With the pending motion, Defendant

argues Plaintiff's age discrimination claims fail because she cannot establish a prima facie case and cannot establish that the reason given by Defendant for terminating her was pretext. (Doc. 27 at 12-20.) Plaintiff responds that she can establish both the prima facie case and that Defendant's proffered reason for her termination was a pretext for unlawful age discrimination. (Doc. 33 at 4-16.) For the reasons discussed below, the Court concludes summary judgement is warranted on Plaintiff's age discrimination claims.

ADEA and PHRA claims are analyzed under the same standard. *See, e.g., Colwell v. Rite Aid Corp.*, 602 F.3d 495, 500 n.3 (3d Cir. 2010). As a result, the Court generally references only the ADEA in this Memorandum.

The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, terms, conditions, or privileges of employment on the basis of their age. *See* 29 U.S.C. § 623(a)(1). As summarized in *Palmer v. Britton Industries, Inc.*, 662 F. App'x 147 (3d Cir. 2016) (not precedential), "[t]he Federal Age Discrimination in Employment Act prohibits employers from taking adverse action against an employee who is at least 40 years old, 29 U.S.C. § 631(a), 'because of such individual's age.' 29 U.S.C. § 623(a)." 662 F. App'x at 150. The "[p]laintiff ha[s] the burden to show that his 'age was the 'but-for' cause of the employer's adverse action.'" *Id.* (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009)).

11

Following *Gross*, the Court of Appeals for the Third Circuit confirmed that the burden

shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03

(1973), is used when a plaintiff does not present direct evidence of discrimination. *Smith v.*

*City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009). The parties agree this is such a case.

(Doc. 27 at 10; Doc. 33 at 4.)

Under *McDonnell Douglas*, the plaintiff bears the initial burden of showing a prima

facie case of discrimination. 411 U.S. at 802. Once the plaintiff establishes a prima facie

case, the burden shifts to the defendant "to identify a legitimate non-discriminatory reason

for the adverse employment action." *Smith*, 589 F.3d at 689. "This burden is 'relatively

light' and is satisfied if the employer provides evidence, which, if true, would permit a

conclusion that it took the adverse employment action for a non-discriminatory reason."

*Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (*citing Tomasso v. Boeing Co.*, 445

F.3d 702, 706 (3d Cir. 2006)). "At this stage, 'the defendant need not prove that the

articulated reason actually motivated its conduct.'" *Id.* (*citing Shellenberger v. Summit*

*Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Once the defendant offers a legitimate non-discriminatory reason, "the burden of

production [shifts] back to the plaintiff to provide evidence from which a factfinder could

reasonably infer that the employer's proffered justification is merely a pretext for

discrimination." *Burton*, 707 F.3d at 426 (*citing Fuentes v. Perskie*, 32 F.3d 759, 764-65 (3d

Cir. 1994)). To survive summary judgment, "the plaintiff must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Here the parties dispute whether Plaintiff can establish a prima facie case of age discrimination. (Doc. 27 at 12; Doc. at 6.) The Supreme Court has explained "that the prima facie case requires evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). This showing "in effect creates a presumption that the employer unlawfully discriminated against the employee," *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 254 (1981). The prima facie burden is not "onerous." *Id.* at 253. To warrant this rebuttable presumption "there must be at least a logical connection between each element of the prima facie case and the illegal discrimination" alleged. *O'Connor*, 517 U.S. at 311-12. To establish a prima facie case of age discrimination, the plaintiff must generally show the following: 1) she is forty years old; 2) the defendant took an adverse employment action against her; 3) the plaintiff was qualified for the position in question; and 4) the plaintiff was replaced by another employee

13

who was sufficiently younger so as to support an inference of discriminatory animus. *Smith*,
589 F.3d at 689.

In *Sarullo v. U.S. Postal Service*, 352 F.3d 789 (3d Cir. 2003), the Third Circuit
Court of Appeals explained that the prima facie test in discrimination cases "remains flexible
and must be tailored to fit the specific context in which it is applied." *Id.* at 798 (citing *Geraci*
*v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996)). This Court elaborated on the
application of the principle to the fourth prong of the prima facie case in *McDonald v. SEIU*
*Healthcare Pennsylvania*, No. 1:13-CV-2555, 2014 WL 4672493, at *10 (M.D. Pa. Sept. 18,
2014):

> Courts have held, for example, that a plaintiff may satisfy the fourth prong of
> the prima facie case by establishing that she was treated less favorably than
> similarly situated younger employees, *see Popko v. Penn State Milton S.*
> *Hershey Med. Ctr.*, No. 1:13–CV–01845, 2014 WL 3508077, at *7 (M.D. Pa.
> July 14, 2014); *Norman v. Kmart Corp.*, No. 3:07CV2222, 2011 WL 3794886,
> at *6 (M.D. Pa. Aug. 26, 2011), *aff'd*, 485 Fed. App'x. 591 (3d Cir. 2012), or by
> alleging facts sufficient to give rise to an inference of unlawful age
> discrimination, *see Pivirotto* [*v. Innovative Systems, Inc.*, 191 F.3d 344, 357 (3d
> Cir. 1999)]; *Grabosky v. Tammac Corp.*, 127 F.Supp.2d 610, 620–21 (M.D. Pa.
> 2000).

*McDonald*, 2014 WL 4672493, at *10. Thus, for an ADEA claim to proceed to trial there
must be some showing of disparate and age-based treatment, either through more
favorable treatment of younger workers, or by some other means. After reviewing the
standard elements of an ADEA prima facie case, *Willis v. UPMC Childrens Hops. of*
*Pittsburgh*, 808 F.3d 638 (3d Cir. 2015), reiterated that "the prima facie case is not 'intended

14

to be rigid, mechanized, or ritualistic,'" and explained "[w]here the plaintiff is not directly replaced, the fourth element is satisfied if the plaintiff can provide facts which 'if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" 707 F.3d at 644 (quoting *Pivirotto*, 191 F.3d at 352).

If a plaintiff seeks to satisfy the fourth prima facie element with evidence that a similarly situated individual was treated differently, the inquiry into whether a comparator was similarly situated takes several factors into account:

> to be considered similarly situated the "employees must be similarly situated in all relevant respects," taking into account factors such as the "employees' job responsibilities, the supervisors and decision makers, and the nature of the misconduct engaged in." *See Wilcher v. Postmaster Gen.*, [441 F. App'x 879, 881 (3d Cir. Aug. 9, 2011)] (citing *Russell v. University of Toledo*, 537 F.3d. 596 (6th Cir. 2008)); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-61 (5th Cir. 2009)). As this court has observed, "In order for employees to be deemed similarly situated, ... the individuals with whom the plaintiff seeks to compare [his] treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ogden v. Keystone Residence*, 226 F.Supp.2d 588, 603 (M.D. Pa. 2002).

*Wesley v. Simona Am. Inc.*, No. 3:15-CV-1110, 2016 WL 8613937, at *6 (M.D. Pa. Nov. 3, 2016), *Report and Recommendation adopted*, No. 3:15-CV-1110, 2017 WL 1173931 (M.D. Pa. Mar. 29, 2017).

Here Plaintiff asserts she has satisfied the fourth prong of the prima facie case because Marchese is a significantly younger similarly situated co-worker. (Doc. 33 at 7.)

Defendant maintains that Marchese is not an appropriate comparator because he is not similar "in 'all relevant respects.'" (Doc. 35 at 8 (quoting *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (not precedential). Specifically, Defendant differentiates the co-workers on the bases that Plaintiff had no medical emergency and she admitted that she could not provide a timeframe in which she could obtain identification. (Doc. 35 at 8-9.)

Some factors set out in *Wilcher*, 441 F. App'x at 881, suggest that Plaintiff and Marchese may be appropriate comparators. Both Plaintiff and Marchese had the same responsibilities as new hires in the process of initial training, and they had the same supervisors, trainer Judy Kunkel and site supervisor Stacy Mason.

Although Plaintiff disputes whether Owen was the decisionmaker for Plaintiff's termination, the Court concludes she has not shown that a genuine issue of material fact exists on the issue. Plaintiff points to Mason's testimony that Owen gave her "permission" for Plaintiff to be terminated. (Doc. 33-1 ¶ 59.) Mason first testified that Owen was the one who made the decision to let Plaintiff go. (Mason Dep., Doc. 33-11 at 9, 28:3-9.[2]) In response to a follow-up question as to how she had "come to reach that information," Mason said that, during her Thursday morning conversation with Owen, Owen was "the one that gave permission" to fire Plaintiff. (*Id.*, 28:10-16.) When asked if she had "ask[ed]

---

[2] The Court's citation to depositions of record are to Plaintiff's exhibits because Plaintiff has provided complete unedited depositions (Docs. 33-6, 33-7, 33-11, 33-15, 33-19, 33-20, 33-21, 33-22) where Defendant has provided excerpts of depositions (Doc. 26-1).

[Owen] for permission to fire Ms. Chase," Mason clarified that she asked Owen "how we would handle her not having her I-9 documentation with no estimate of when those documents would be in, and I knew we had already missed our 72-hour deadline" and Owen responded "we would need to terminate." (*Id.* 28:17-29:15.) Owen also testified that she was the one who made the decision to terminate Plaintiff. (Owen Dep., Doc. 33-20 at 4, 11:5-11.) No evidence of record contradicts Mason's and Owen's testimony of the decisionmaker issue or otherwise infers that Owen did not make the decision to terminate Plaintiff. On these facts, a reasonable factfinder could not conclude that Owen did not make the decision to terminate Plaintiff. Therefore, for purposes of the comparator analysis, Owen was the main decisionmaker for Plaintiff's termination while Mason decided the accommodation for Marchese.

Although Plaintiff and Marchese arguably engaged in the same conduct insofar as neither timely submitted I-9 documents, there were "differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it," *Ogden,* 226 F. Supp. 2d at 603: Plaintiff's failure to provide documents was not due to medical absence as was the case with Marchese; and Plaintiff admitted that she did not provide a timeframe for submitting I-9 documentation (Doc. 33-1 ¶ 58) where no evidence suggests Marchese would not provide the documentation upon his return. In *Martino v. Southern Financial Group,* 715 F.3d 195 (7th Cir. 2013), the substantially different "nature of

17

I-9 issues vis-à-vis the termination decision" precluded finding the suggested comparator suitable in the similarly-situated inquiry. *Id.* at 204. The record here shows Plaintiff's and Marchese's I-9 issues are substantially different. Therefore, Plaintiff has not satisfied her burden of showing that Marchese was a similarly situated employee. As she presents no other comparator, she cannot satisfy the fourth prong of her prima facie case by showing that a sufficiently younger employee was treated more favorably.

Plaintiff also urges the Court to find that the fourth prong is satisfied because her request to make up time was denied under circumstances that give rise to an inference of discrimination. (Doc. 33 at 7.) In support of the general argument that she has established an inference of discrimination, Plaintiff notes that, in addition to being relevant to her retaliation claim, her request to be allowed to make up time as Marchese was permitted is relevant to her prima facie case as the request was denied after she "almost unquestionably made a complaint of age discrimination to Stacy Mason" a short time before she was fired. (Doc. 33 at 7.) She also asserts the following: Defendant's argument that make-up training was not available lacks credibility; Mason's characterization of the termination as a type of government requirement is not supported by law and, if it was, an exception was made for Marchese; emails stated that the consequence for failing to turn in I-9 documents was suspension; Plaintiff was a rehire who had a permanent ID with the company; her background check provided both her maiden name and married name and indicated she

18

had completed basic employment verification; Defendant's argument that certain people were not aware of Plaintiff's rehire status is not credible; Mason admitted she knew Plaintiff was a former employee; and there is a dispute of fact as to whether Mason asked for permission to fire Plaintiff from Tracy Owen. (Doc. 33 at 7-10.)

Assuming Plaintiff's assertions to be true for purposes of her prima facie age discrimination showing, she does not point to a single fact that relates to discrimination on the basis of age. As set out above, the rebuttable presumption established with the prima facie case is only warranted where there is a logical connection between the element and the illegal discrimination. *O'Connor*, 517 U.S. at 311-12. Thus, no matter how flexible the fourth prong of an age discrimination prima facie case is, facts relied upon to create an inference of age discrimination must show a logical connection with such discrimination. The record in this case is devoid of age references or potential inferences except for the facts that Kunkel mistakenly posted the spreadsheet that included new hires' birthdates several days before Plaintiff was terminated, Plaintiff alleged that after the spreadsheet was posted two coworkers made derogatory comments related to her age and where she lived, she told Kunkel about the coworker conduct the day before her termination, and she told Mason about it the morning of her termination. The record does not show that any of Defendant's administrative employees ever made a comment, expressly or inferentially, about age of any sort before or after Plaintiff lodged her complaints. Kunkel and Mason

mention age only at their depositions in the context of being asked whether other new hires made comments about Plaintiff's age or Plaintiff reported coworker harassment about her age. (Doc. 33-6 at 6, 17:4-7; Doc. 33-11 at 7-8, 20:16-22:8.) Kunkel said she never heard any comments about age and both Mason and Kunkel denied Plaintiff had complained about age-related harassment and were unsure what had been said about the spreadsheet display. (*Id*) Plaintiff does not proffer other allegedly age-related terminations by Defendant or any adverse action whatsoever which might be connected to age bias. She relies on flaws and inconsistencies in statements made and actions taken by Defendant's administrative employees, apparently presuming they create the inference that the decision to terminate her was based on age. On this record, the Court is not persuaded that Plaintiff has pointed to evidence sufficient to raise an inference of unlawful age discrimination, the minimum showing required. *See, e.g., Pivirotto*, 191 F.3d at 357. However, the Court will assume *arguendo* that Plaintiff has made the required prima facie showing and proceed with the *McDonnell Douglas* analysis

  As noted above, a defendant's burden of production at step two is "'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426. Defendant maintains that the sole reason for Plaintiff's termination was her failure to produce the legally required documents. (Doc. 27 at 7.) Plaintiff assumes

*arguendo* that this is a legitimate non-discriminatory reason for the termination. (Doc. 33 at 13.)

Once the defendant meets the step-two burden, the presumption of discriminatory action raised by the prima face case is rebutted. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). The burden then shifts to the plaintiff who "must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action." *Sarullo*, 352 F.3d at 797 (citing *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804).

As set out above, at the summary judgment stage this requires the plaintiff to "point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. For an ADEA claim, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009). In *Gross*, the Court concluded that, unlike a Title VII discrimination claim which can be maintained with a showing that an improper consideration was a motivating factor for the employer's action, the ADEA requires proof that the prohibited criterion was the but-for cause of the prohibited

21

conduct. *Id.* at 174, 177. As *Gross* explained, "the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act." 557 U.S. at 176 (citing *Hazen Paper Co. v. Biggins*, 507 U.D. 604, 610 (1993) (explaining that the claim "cannot proceed unless the employee's protected trait actually played a role in [the employer's decisionmaking] process and had a determinative influence in the outcome."); *see also Palmer v. Britton Indus., Inc.*, 662 F. App'x 147, 150 (3d Cir. 2016) (not precedential) (citing *Gross*, 557 U.S. at 176) ("It was not enough to show that his age was *a* factor motivating the decision to fire him. Instead, [the plaintiff] had to point to summary judgment evidence supporting an inference that his age had a determinative influence on the decision."). The Court earlier described "but-for" causation to require a showing "that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

Under the first prong of the pretext analysis, *Fuentes* explained what the plaintiff must show.

> To discredit the employer's proffered reason, . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (internal citations and quotations omitted). *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997), quoted *Fuentes* and added "[a]s another court of appeals has put it, 'federal courts are not arbitral boards ruling on the strength of 'cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." *Id.* (quoting *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996)). *Keller* added that a plaintiff "must show not only that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." 130 F.3d at 1109. More recently, the Circuit Court framed the burden under the first prong in terms of the plaintiff being required to "submit evidence which . . . casts doubt upon the legitimate reasons proffered by the employer such that a fact-finder could reasonably conclude that the reasons were a fabrication." *Howell v. Millersville Univ. of Pa.*, No. 17-3538, ---F. App'x---, 2018 WL 4236592, at *2 (3d Cir. Sept. 6, 2018) (not precedential) (quoting *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008)).

Plaintiff asserts that the evidence relied on for her prima facie case argument also applies to the pretext consideration. (Doc. 33 at 13.) In this section of her brief, Plaintiff first highlights the fact that she was terminated rather than suspended, asserting that "[t]he record indicates that the consequence for failing to provide I-9 documentation was suspension." (*Id.* at 13-14.) Presumably, Plaintiff is referring to the email which Gallert sent

23

to Kunkel on Wednesday, March 25, 2015, indicating that certain employees had outstanding I-9 issues and the issues "needed [to be] addressed today so they can take care of prior to COB tomorrow. If these issues are not resolved at that time, the employee will be suspended pending they can provide appropriate documents." (Doc. 26-1 at 112.) Regarding Plaintiff, the email indicated that "Gloria Saporito" needed "to provide documents with correct last name. She filled out all new hire forms with 'Saporito' the documents need to match." (*Id.*) Gallert then noted "**All documents must be unexpired as well," and closed with the comment "[l]et me know if they have any questions." (*Id.*)

If this email is the evidence Plaintiff relies upon for the proposition that suspension was the appropriate consequence, she cannot show pretext on the basis alleged by pointing to an email from a person who was not the decisionmaker. While Owen conferred with Gallert about Plaintiff's failure to provide documents (Doc. 33-20 at 4, 11:12-20), Owen testified that Gallert had no authority to say that Plaintiff would be suspended rather than fired (Doc. 33-20 at 7, 22:4-7) and she made the decision to terminate Plaintiff because Gallert had told her that Plaintiff "had not complied and was unable to get any of the documents that were required for I-9 compliance" (*id.* at 4, 11:21-24). Owen also testified that she had the discretion to suspend or terminate Plaintiff by virtue of her "abilities under [her] current role" and she did not suspend Plaintiff because Plaintiff did not know when she would be able to get the required documents. (*Id.* at 5, 16:12-20.) This unrefuted testimony

24

indicates that Owen had the authority to terminate rather than suspend Plaintiff—she consulted with Gallert and no evidence suggests that Gallert had the authority to decide the repercussions of not being able to provide I-9 documentation within a given timeframe.

Elsewhere in her brief, Plaintiff asserts there is a dispute of material fact as to whether Mason asked Owen for permission to fire Plaintiff, implying that Mason was the decisionmaker. (Doc. 33 at 10.) However, as discussed previously, Plaintiff's assertion does not give rise to a disputed issue of material fact in that the record shows Mason clarified what she meant by permission and no evidence suggests Owen was not the decisionmaker. *See supra* pp. 16-17. Further, even if there were a disputed fact as to the decisionmaker's identity, such a dispute would not show that termination was not an available option to suspension.

The record may support the conclusions that the decision to terminate Plaintiff was not based on careful consideration of the facts related to her I-9 issues, administrative personnel were not sensitive to the predicament created by Plaintiff's use of her maiden name on her application, and the decision to terminate rather than suspend Plaintiff was harsh. However, the difference between what was said in Gallert's email and the subsequent final decision does not present a contradiction that a reasonable factfinder could find Owen's rationale unworthy of credence: it is undisputed that she had the authority to terminate Plaintiff, Plaintiff had not submitted acceptable paperwork in response to

Gallert's email, and Plaintiff indicated that she did not know when she would be able to do so.

Plaintiff maintains it is "highly suggestive of pretext" that federal law does not require what Defendant says regarding I-9's provision addressing the situation where an employee does not have the appropriate documentation. (Doc. 33 at 15.) This argument is made in the context of Defendant's application of provisions of the Immigration Reform and Control Act of 1996 ("IRCA"). (*Id.* at 14-15 & n.3.)

As explained in *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195 (7th Cir. 2013), IRCA

> requires employers to complete documents verifying each employee's identity and eligibility to work in the United States within three business days of hiring using Form I–9, Employment Eligibility Verification ("I–9 form"). 8 U.S.C. § 1324a(a)(1)(B); 8 C.F.R. § 274a.2(a)(2), (b)(1)(ii). If an employee does not have the appropriate employment eligibility verification document, the employer must accept a receipt showing that the employee has applied for a replacement document. 8 C.F.R. § 274a.2(b)(1)(vi). The employee then has 90 days to produce the replacement document. *Id.* § 274a.2(b)(1)(vi)(3).

715 F.3d at 199. In support her argument Plaintiff points to additional language found in §

274a.2(VI) which she says "**required**" Defendant to accept the camera card as a "receipt."

(Doc. 33 at 15.)

> (vi) Special rules for receipts. Except as provided in paragraph (b)(1)(iii) of this section, unless the individual indicates or the employer or recruiter or referrer for a fee has actual or constructive knowledge that the individual is not authorized to work, an employer or recruiter or referrer for a fee must accept a receipt for the application for a replacement document or a document described in paragraphs (b)(1)(vi)(B)(1) and (b)(1)(vi)(C)(1) of this section in lieu of the

required document in order to comply with any requirement to examine documentation imposed by this section, in the following circumstances:

(A) Application for a replacement document. The individual:

(1) Is unable to provide the required document within the time specified in this section because the document was lost, stolen, or damaged;

(2) Presents a receipt for the application for the replacement document within the time specified in this section; and

(3) Presents the replacement document within 90 days of the hire or, in the case of reverification, the date employment authorization expires

8 C.F.R. § 274a.2(VI).

Though the parties dispute whether this provision, known as the "receipt-rule," *see Martino*, 715 F.3d 195, applied in the circumstances of this case (Doc. 33 at 15; Doc. 35 at 10), for purposes of this motion, the Court will assume *arguendo* that Defendant did not correctly apply the I-9 receipt rule. Even with this assumption, Plaintiff needs to show more than mistake to show legally significant pretext: the issue of pretext does not address the correctness of the reason offered; "[r]ather, it addresses the issue of whether the employer honestly believes in the reasons it offers." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (citing *McCoy v. Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992)).

The precise issue of whether an employer's allegedly improper consideration of the receipt rule was indicative of pretext was addressed in *Martino* where the plaintiff argued that the defendant's human resource division manager knew he was entitled to the rule's ninety-day grace period but declined to apply it and the only reasonable inference of this action was that she wanted him discharged for a discriminatory reason. 715 F.3d at 205. The Seventh Circuit disagreed: "Whether the receipt rule applied is not the issue in the pretext analysis. Rather, to show that [the defendant's] nondiscriminatory explanation was pretextual, Martino must show that Corlett believed that Martino was entitled to a ninety-day grace period under the receipt rule but chose not to apply it." *Id.* (citing *McCoy,* 957 F.2d at 373). In the circumstances of the case, *Martino* found the evidence did not support the plaintiff's assertion that the HR manager knew the receipt-rule applied or his conclusion that her receipt-rule analysis was pretextual. *Id.*

Here Plaintiff argues only that Defendant was required to accept the camera card under the receipt rule and did not do so, thus depriving Plaintiff of the ninety days she would have had under the rule to produce the document. (Doc. 33 at 15.) Putting aside the arguable factual flaws contained in the argument (*see* Doc. 35 at 10), Plaintiff makes no attempt to show that Owen or anyone else knew the receipt-rule applied and chose not to apply it. Thus she has not presented evidence that the alleged failure to apply the receipt rule was a pretext for discrimination and the evidence in the record does not support the

inference. Owen's testimony included the following statements: the I-9 document list

provided to employees includes "such things as birth certificates, valid driver's licenses,

valid passports and such" (Doc. 33-20 at 10, 33:20-34:5); she was not aware of Defendant

accepting any forms of identification beyond what was on the list, "[i]t has to be something

on the list" (*id.*, 34:13-17); "we comply with the law that says we have to produce these

documents" (*id.*, 33:6-7); "Our understanding is due to the federal law that we are not

allowed to have employees work if they have not produced those documents within three

business days . . . [s]o our . . . action if they don't is to either suspend[] them or terminate

them" (*id.*); and a corporate employee has the authority to make that decision (*id.*, 35:10-

36:5). From this testimony, taken in conjunction with that reviewed above concerning the

specifics of the decision to terminate Plaintiff, a reasonable factfinder could not conclude

that Owen believed she acted inappropriately in Plaintiff's case. Therefore, failure to

provide Plaintiff with a ninety-day period to produce documents does not show pretext for

discrimination.

Before moving to the *Fuentes*' second prong, the Court will briefly review evidence

presented at the prima facie stage which Plaintiff also relies upon at step three. (*See* Doc.

33 at 13.) Evidence identified related to treatment of Marchese (Doc. 33 at 7-8) does not

show pretext for the reasons discussed above: he is not a proper comparator so any

29

discrepancy between his treatment and Plaintiff's is not evidence of pretext. *See supra* pp. 17-18.

Plaintiff asserts that "to the extent Defendant attempts to argue that make-up training was unavailable, such an argument lacks credibility." (Doc. 33 at 8.) Plaintiff points to a Saturday make-up training for Marchese as evidence that the accommodation was available. (*Id.*) But Plaintiff does not refute with evidence of record that Owen did not make the decision to allow Marchese to make up the time missed in the first week or that Owen did not know about Mason's accommodation when she terminated Plaintiff. (Doc. 26 ¶ 71; Doc. 33-1 ¶71.) Nor does she point to evidence which shows Owen believed that Plaintiff could work until she provided the required documentation or make up an indeterminate amount of time if she was suspended until she provided the documentation. The record shows that Owen testified that Gallert told her Plaintiff did not know when she could produce the required documents (Doc. 33-20 at 4-6, 11:14-24, 16:23-17:4) and Mason provided the same information (Doc. 33-11 at 22, 79:24-80:9). This testimony indicates that Owen did not know the duration of the period of time Plaintiff would be out of work and miss training. Evidence showing that limited make-up training was available does not show that more extensive make-up training was possible for Plaintiff or anyone else. Therefore, Plaintiff's conclusory assertion that an argument that make-up training was unavailable for Plaintiff

lacks credibility could not provide a basis for a reasonable factfinder to conclude that the reason for termination was pretext.

Plaintiff's reliance on Mason's characterization of the termination as "some type of government requirement" (Doc. 33 at 8) is also unavailing. For reasons similar to those discussed above regarding IRCA compliance, a misapprehension about a regulatory provision does not show pretext without a showing that the error was knowing and intentional. *See, e.g., Martino,* 715 F.3d at 205. More importantly, this principle applies to the decisionmaker. *Id.* Mason testified that Owen made the decision to terminate Plaintiff (Doc. 33-11 at 9, 28:3-29:9), Owen testified that she made the decision to terminate (Doc. 33-20 at 4, 11:5-11), and, as the Court previously decided, Plaintiff presents no evidence sufficient to contradict this testimony. In this context, the fact that Mason did not make a recommendation to Owen about suspending Plaintiff rather than terminating her does not show that Owen's proffered reason for termination was pretextual. The question of whether the decision not to weigh in on Owen's decision was due to a belief that a government recommendation regarding documentation was in play (Doc. 33-11 at 10) or some other reason may go to Mason's credibility, but, without more, that credibility question is not imputed to Owen. No evidence suggests that Mason was tasked with IRCA compliance or interpretation such that she was to inform Owen about the application of relevant provisions to Plaintiff's case—a situation which would put her in the position of a co-decisionmaker..

Plaintiff next points to evidence related to "rehire" status, she had a permanent ID number with the company, and information contained in her background check showed both names and her eligibility to work. (Doc. 33 at 9.) Although the Court does not find that Defendant's evaluation of Plaintiff's employment status could be characterized as thorough, the inquiry is not whether HR and other administrative personnel did a good job. As the Circuit Court has regularly reminded, "we do 'not sit as a super-personnel department that reexamines an entity's business decisions.'" *Capps,* 847 F.3d at 154 n.9 (quoting *McCoy,* 957 F.2d at 373; *Boyle v. Penn Dental Med.,* 689 F. App'x 140, 144 (3d Cir. 2017) (quoting *Capps*). While the evidence shows some administrative personnel knew Plaintiff had worked for a company absorbed by Defendant, the employment ended eight years earlier. (Doc. 26 ¶ 6; Doc. 33-1 ¶ 6.) Importantly, Plaintiff never explicitly told Gallert, Mason, or Kunkel that she had completed the I-9 paperwork for her previous employment. Rather, in a March 19th pre-employment email she sent to Gallert in response to Gallert's email outlining "First Day Details" including the need for two-forms of ID to establish identity and work eligibility within the U.S., Plaintiff said "I will bring ID. I completed paperwork previously." (Doc. 26-1 at 89; Doc. 33-1 ¶ 82.) The fact that Plaintiff's maiden name and married name appeared on numerous documents, including her application and background check, raises a question as to why some procedure to address the I-9 problem could not have been worked out. However, the record evidence does not show that Plaintiff's direct

conversations about the name confusion issue with Kunkel (first day of employment and day before termination) and Mason (day of termination) were shared with Owen before she made the decision to terminate Plaintiff. Moreover, it is not disputed that following Gallert's March 25th email Plaintiff did not provide a document needed to establish employment authorization as identified in Gallert's March 19th email.

Plaintiff avers that the timing of her termination applies to her discrimination claim as well as her retaliation claim. (Doc. 33 at 7.) Plaintiff does not provide authority or otherwise develop an argument to support a conclusion that the timing shows pretext for discrimination *on the basis of age*. Importantly, while suspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination, "timing alone does not create a genuine issue as to pretext if the plaintiff is unable to prove, through other circumstantial evidence, that he was terminated for a reason other than that proffered by the employer." *Pugh v. City Of Attica, Indiana*, 259 F.3d 619, 628–29 (7th Cir. 2001) (internal citation omitted). Thus, suspicious timing is only sufficient to demonstrate a showing of pretext if the plaintiff presents other evidence (in addition to his own explanation) that casts doubt on the veracity the proffered reason for the adverse action. (*Id.*) The foregoing review indicates that Plaintiff has not produced such evidence.

In sum, the evidence cited by Plaintiff is not sufficient to allow a factfinder to reasonably disbelieve Defendant's articulated reason for termination. In making this

33

determination, the Court adheres to the guiding principle set out in *Boyle*: "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. The issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers." 689 F. App'x at 144 (internal quotations omitted). Here Plaintiff has not produced evidence creating a genuine dispute for trial that Owen did not honestly believe that she terminated Plaintiff for a reason other than her failure to comply with I-9 documentation requirements.

Turning to the second method of establishing pretext, Plaintiff must present evidence from which a factfinder could reasonably believe that an invidious discriminatory reason was more likely than not the but-for cause of Defendant's action. *Fuentes*, 32 F.3d at 764; *Gross*, 557 U.S. at 177.

> The plaintiff can show pretext this way by presenting evidence "with sufficient probative force" so as to allow the factfinder to "conclude by a preponderance of the evidence that age was a . . . determinative factor." *Simpson*, 142 F.3d at 644–45 (citing *Keller*, 130 F.3d at 1111). Pointing to evidence demonstrating any of the following satisfies this second way to prove pretext: (1) the defendant previously discriminated against the plaintiff; (2) the defendant discriminated against others within the plaintiff's protected class; or (3) the defendant has treated similarly situated, substantially younger individuals more favorably. *Simpson*, 142 F.3d at 645 (citing *Fuentes*, 32 F.3d at 765). If this step is satisfied, at trial the plaintiff must convince the factfinder that not only was the employer's proffered reason false, but the real reason was

impermissible discrimination. *Fuentes,* 32 F.3d at 763 (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. 2742).

*Willis v. UPMC Children's Hosp. of Pittsburgh,* 808 F.3d 638, 645 (3d Cir. 2015).

Plaintiff avers that the evidence cited to support pretext also supports the conclusion that Mason, Gallert, Kunkel and/or Owen were motivated by an invidious discriminatory reason. (Doc. 33 at 16.) To support this assertion, Plaintiff posits that "[i]t is genuinely hard to believe that trained HR processionals would be completely unaware of I-9 applicable regulations. And, again, Plaintiff was a former employee with an ID number." (*Id.*) The Court concludes Plaintiff has not satisfied her burden of showing a genuine dispute for trial as to pretext based on the second prong of the *Fuentes* analysis.

Plaintiff has not pointed to evidence that would allow a factfinder to reasonably disbelieve Defendant's articulated reason for termination, and she does not discuss how the evidence unsuccessfully relied upon to satisfy the first prong satisfies the second prong. Further, Plaintiff has not provided additional evidence addressing specific second-prong methodology. Plaintiff does not even suggest that Defendant previously discriminated against her or against others within her protected class. Although she has attempted to show discrimination based on treatment of an allegedly similarly situated individual, the Court has rejected her argument that the identified comparator was similarly situated as required under the ADEA. *See supra* p. 22. Further, as noted in the context of Plaintiff's prima facie case, the record is devoid of any disparaging reference to age or any inference

of age bias on the part of any of Defendant's employees. *See supra* p. 24. Therefore, Plaintiff has provided no evidence upon which a factfinder could reasonably believe that an invidious discriminatory reason was more likely than not the but-for cause of Defendant's action.

Having failed to point to sufficient evidence to allow a factfinder to reasonably find that Defendant's proffered reason for termination was a pretext for discrimination, the Court concludes summary judgment is properly granted on Plaintiff's ADEA and PHRA claims for age discrimination.

### b. Retaliation

Defendant maintains Plaintiff's ADEA and PHRA retaliation claims must fail because she cannot satisfy the third element of the prima facie case in that she cannot show that the adverse decision was causally connected to her alleged complaint of age-based harassment. (Doc. 27 at 20.) Plaintiff responds that there are disputes of material fact regarding her retaliation claim which preclude summary judgment. (Doc. 33 at 16.) Because credibility and the weight of evidence are at issue, the Court concludes that summary judgment is not proper on Plaintiff's retaliation claims.

The ADEA specifically prohibits employers from retaliating against employees or applicants who complain about age-based discrimination. 29 U.S.C. § 623(d). Absent direct evidence, a court is to use the *McDonnell Douglas* burden shifting framework to analyze

36

retaliation claims under the ADEA, Title VII, and the PHRA. *Daniels v. School Dist. of Philadelpia*, 776 F.3d 181, 193 (3d Cir. 2015) (citations omitted).

> Under the *McDonnell Douglas* framework, a plaintiff asserting a retaliation claim must first establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Id.* (quoting *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007). ADEA and PHRA retaliation claims are governed by the same set of precedents. *Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 564, 567 (3d Cir. 2002).

*Daniels* notes that retaliation cases often turn on whether a plaintiff can establish the causal connection requirement. 776 F.3d at 196.

> "We consider 'a broad array of evidence' in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment." *LeBoon [v. Lancaster Jewish Community Center Assn.*, 503 F.3d 217, 232 (3d Cir. 2007)] (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)). To demonstrate a link between protected activity and an employer's adverse action, a plaintiff may rely on the temporal proximity between the two if "unusually suggestive." *Id.; Marra*, 497 F.3d at 302. In the absence of such a close temporal proximity, we consider the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action. *See LeBoon*, 503 F.3d at 232–33; *Marra*, 497 F.3d at 302; *Farrell*, 206 F.3d at 280–81. The plaintiff, however, cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted. *See \*197 Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007); *Moore [v. City of Philadelphia*, 461 F.3d 331, 351 (3d Cir. 2006)]; *cf. Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

*Daniels,* 776 F.3d at 196–97.

Here Defendant first focuses its argument on the assertion that Plaintiff cannot satisfy the third element of the prima facie case. (Doc. 27 at 20.) Defendant maintains the necessary causal connection is missing because, even assuming Plaintiff complained of the alleged age-related harassment to Mason and Kunkel, the decisionmaker, Owen, was not aware of the complaints when she terminated Plaintiff. (Doc. 27 at 20-21 (citing *Ambrose,* 303 F.3d at 493).) Defendant points to Plaintiff's undisputed statement that "'Mason never reported [Plaintiff's] complaint to HR'" in support of the assertion that Owen did not know of the complaint so the causal connection is lacking. (Doc. 35 at 13 (quoting PSOF ¶ 121).) Defendant next argues that Plaintiff's inability to produce I-9 documentation breaks any causal chain between her complaint and her termination. (*Id.* at 21-22 (listing cases).) Plaintiff responds that "coupled with the obvious fact that Plaintiff complained to Mason earlier in the morning" on the day she was terminated, Plaintiff asserts that "there is a dispute of material fact as to whether Owen was the actual or sole decision maker in light of Mason's testimony that she asked for permission to terminate." (Doc. 33 at 18 (citing Doc. 33-1 ¶¶ 118-120).)

As discussed above, the Court found that Plaintiff did not point to a genuine issue of material fact as to whether Owen was the decisionmaker in that Mason clarified what she meant by "permission" and both she and Owen consistently testified that Owen made the

38

decision to terminate rather than suspend Plaintiff. *See supra* pp. 16-17. Plaintiff has not shown that Owen did not make the decision to terminate her, and she does not point to evidence indicating that Owen knew of Plaintiff's complaint to Mason. As Defendant points out, Plaintiff says that Mason did not report the complaint she had made to Mason on the morning she was fired to human resources. (Doc. 33-1 ¶ 121.) Therefore, her conclusory assertion that the issue of causation is for a jury because there is a disputed material fact as to whether Owen was the sole decisionmaker which must be resolved by a jury (Doc. 33 at 18) is insufficient to satisfy her prima facie burden.

This conclusion does not end the inquiry of whether Plaintiff can show retaliation under the ADEA and PHRA because Plaintiff proceeds to advance her retaliation claims based on a "cat's paw" theory of liability which is also known as the "subordinate bias" theory.[3] (Doc. 33 at 18.) Under the cat's paw theory, a plaintiff seeks to hold her employer liable for the animus of a nondecisionmaker. *See McKenna v. City of Philadelphia*, 648 F.3d 171, 177 (3d Cir. 2011) (internal citation omitted). "In *Staub v. Proctor Hosp.*, [562 U.S. 411] (2011), the Supreme Court addressed 'the circumstances under which an

---

[3] As the Supreme Court explained in *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011), the "term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Id.* at 415 n.1; *Howell v. Raymours Furniture* Co., 26 F. Supp. 3d 366, 372 n.6 (M.D. Pa. 2014) (quoting *Staub*, 562 U.S. at 415 n. 1).

employer may be held liable for employment discrimination based on the discriminatory

animus of an employee who influenced, but did not make, the ultimate employment

decision.'" McKenna, 648 F.3d at 172 (quoting Staub, 562 U.S. at 413).[4] This principle

applies to both discriminatory and retaliatory animus on the part of an individual who

influenced or participated in the adverse decision. See Macknet v. Univ. of Pennsylvania,

738 F. App's 52, 57 (3d Cir. 2018) (not precedential).

At the summary judgment stage, a plaintiff advancing a cat's paw theory based on

alleged retaliatory or discriminatory animus of a nondecisionmaker must establish that there

is a genuine issue of material fact as to (1) the animus of the subordinate, and (2) whether

the subordinate's animus translated into retaliatory actions that caused the decisionmaker to

take adverse employment action. Thomas v. Berry Plastics Corp., 803 F.3d 510, 515 (10th

Cir. 2015). In the words of our Circuit Court, "proximate cause" is the standard used: "The

Supreme Court has clarified that in 'cat's paw' cases the relevant question is whether a

bias-motivated action was the proximate cause of the ultimate employment action." Smith

v. Comhar, Inc., 722 F. App'x 314, 318–19 (3d Cir. 2018). Proximate cause "requires 'some

direct relation between the injury asserted and the injurious conduct alleged'" and excludes

---

[4] Staub was decided in the context of the Uniformed Services Employment and Reemployment Rights Act
("USERRA"). 562 U.S. at 411. The Third Circuit Court of Appeals has applied the theory in Title VII and
ADEA cases. See, e.g., Macknet, 738 F. App'x at 57; McKenna, 648 F.3d at 177.

links that are "remote, purely contingent, or indirect.'" *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330–31 (3d Cir. 2015) (quoting *Staub,* 562 U.S. at 419).

Plaintiff maintains that a reasonable jury could conclude that "Mason's involvement in the termination process was tainted with discriminatory and/or retaliatory intent." (Doc. 33 at 20.) She asserts that evidence supporting causation and pretext includes the following: "the state of federal law applied to this situation," the awareness of Mason and others about Plaintiff's former employment status, the awareness of Mason and others about Plaintiff's maiden name issue, and the inconsistency of punishment given the written e-mails calling for suspension." (*Id.*) She further asserts these, as well as Mason's "self-serving 'shock' in response to Plaintiff's complaint," are factual disputes to be resolved by a jury. (*Id.*)

Defendant responds that Plaintiff's reliance on the cat's paw theory is misplaced because there is no evidence that Mason had discriminatory or retaliatory animus toward Plaintiff or that Mason intended to have Plaintiff terminated. (Doc. 35 at 14.)

The Court rejects Plaintiff's assertion that Mason's conduct was tainted with discriminatory animus for the reasons discussed in the preceding section of this Memorandum, i.e., no evidence suggests that Mason harbored any age bias. *See supra* p. 23. Whether Mason engaged in activity motivated by retaliatory animus is a separate matter. Plaintiff's argument in support of the cat's paw theory of recovery is somewhat vague and conclusory. However, the Court finds the evidence referenced could support a

41

conclusion by a reasonable factfinder that retaliatory animus was a proximate cause of Plaintiff's termination.

Assuming that Plaintiff complained to Mason about age-related harassment,[5] evidence shows that Mason called Owen less than two-hours after Plaintiff complained to her. Mason did not share any information about the specifics of Plaintiff's situation with Owen other than informing Owen that Plaintiff did not know when she could get the required documentation. (See Doc. 33-11 at 22.) Plaintiff told Mason at the interview about using her maiden name rather than her married name (Doc. 26 ¶ 17; Doc. 33-1 ¶ 17), and Plaintiff testified that Mason said that was fine (Doc. 33-1 ¶ 102). This information combined with Gallert's March 25th email (Doc. 26-1 at 112) shows Mason knew that the documentation problem was complicated by Plaintiff's decision to use her maiden name on her application yet this apparently was not discussed by Mason and Owen. (See Doc. 33-11 at 22.) Plaintiff testified she told Mason on the morning of her termination about sending the baptism certificate the night before and Mason then said to go to work. (Doc. 33-7 at 24, 92:1-3.) From her conversation with Kunkel the preceding day, Plaintiff understood that the baptism certificate could clear up the documentation problem. (Doc. 33-7 at 19-20, 72:7-73:2.) Mason testified that she told Plaintiff in her second phone call on Thursday that the baptism certificate was not an acceptable form of identification. (Doc. 33-11 at 18.) This

---

[5] In addressing Plaintiff's claim of retaliation, Defendant does not argue that Plaintiff did not engage in a protected activity. (Doc. 27 at 20; Doc. 35 at 13-16.)

evidence shows Mason was aware that Plaintiff had attempted to satisfy the I-9

requirements by submitting her baptism certificate, yet she did not share that information

with Owen. (See Doc. 33-11 at 22.) Mason knew that Plaintiff had been employed by a

company absorbed by Defendant (Doc. 33-11 at 6, 16:9-25), yet she did not mention this to

Owen or ask about a record search (see Doc. 33-11 at 22.) Mason testified that, during her

second conversation with Plaintiff on the Thursday of the termination, she asked Plaintiff if

she would have her documentation within a week or two weeks "so we could work

something out with her if she gave us some type of time frame to work with, and she didn't.

She just said, 'I don't know when she can get them.' So we had no recourse but to

terminate her because we had no end date." (Doc. 33-11 at 22, 80:2-8.)

Mason also testified that she knew it took about a week to get a copy of a social

security card and she agreed that Plaintiff could not know when she would receive the

documentation but she said Plaintiff "could have put forth some effort as to, you know, when

she would go to try to obtain the documents and when she would get them. . . . She didn't

give any of that, so I had nothing to work with other than we don't have the documents."

(Doc. 33-11 at 22-23, 81:11-82:18.) Though Plaintiff's recollection of the second phone call

is vague, she said that if Mason asked her for her birth certificate and she said she did not

have it, she would have meant she did not have it with her and would have to look for it.

(Doc. 33-7 at 25, 944-9.)

Evidence of "unusually suggestive" temporal proximity, *LeBoon,* 503 F.3d at 232, between Plaintiff's complaint and Mason's call to Owen coupled with the fact that Mason did nothing to provide potentially relevant information to Owen are sufficient to create a triable issue on whether Mason's withholding of information from Owen was motivated by retaliatory animus. This conclusion is bolstered by evidence that indicates Mason was initially very supportive of Plaintiff's employment with Defendant (*see* Doc. 33-7 at 11, 40:17-22) but did nothing to help her after Plaintiff lodged what she contends was an age related complaint on Thursday morning, March 26, 2015. Despite her testimony that she did not discuss suspension rather than termination with Owen because "that was a government recommendation" (Doc. 33-11 at 10, 32:24-33:6), Mason knew that exceptions could be made in some circumstances based on the handling of Marchese's medical situation and it could be inferred from her testimony that Plaintiff had given her "nothing to work with other than we don't have the documents" (Doc. 33-11 at 23, 82:16-18) that more information could have resulted in a different outcome. These considerations raise questions of credibility regarding Mason's articulated reasons for not discussing alternatives to termination with Owen. Further, Mason's failure to fully apprise Owen of the circumstances of Plaintiff's I-9 problem could be considered suspect because evidence shows that at least some responsibility for Plaintiff's documentation confusion may be attributable to Defendant: Plaintiff told Mason at her interview about using her maiden name

instead of her married name (Doc. 26 ¶ 17; Doc. 33-1 ¶ 17) and no evidence suggests she was informed of a potential problem related to the decision; Kunkel told Plaintiff on the first day of training to let HR work out the maiden name/married name documentation issue (Doc. 33-1 ¶ 81); and, on the day before Plaintiff's termination, Kunkel concurred with Plaintiff regarding Plaintiff's plan to send in her baptism certificate and marriage license (Doc. 33-1 ¶¶ 90-91). While it is not clear what Mason knew about Kunkel's conversations with Plaintiff, minimal investigation on her part and in her role as site supervisor would have revealed that Kunkel's comments to Plaintiff did not help Plaintiff's maiden name/married name compliance problem.

In terms of the proximate causation required by *Staub*, the foregoing evidence review shows that a reasonable factfinder could find the required causation in that evidence could support the conclusion there was "some direct relation" between Mason's characterization of the documentation problem to Owen (including evidence *not* revealed to Owen) and Owen's decision to terminate rather than suspend Plaintiff. *See Jones*, 796 F.3d at 330-31. A reasonable factfinder could conclude that Mason's failure to inform Owen of the circumstances as she knew them at the time she called Owen caused Owen to terminate rather than suspend Plaintiff. As set out above, Mason implicitly acknowledged that more information about the documentation could have resulted in a decision not to terminate. Thus, the Court rejects Defendant's conclusion that no evidence suggests that

45

Mason influenced Owen to make the decision to terminate Plaintiff. (*See* Doc. 35 at 16.) Rather, evidence shows that the question of whether Defendant is liable to Plaintiff for retaliation based on the cat's paw theory of recovery is one for a jury.

## V. CONCLUSION

For the reasons discussed above, Defendant Frontier Communication Corporation's Motion for Summary Judgment (Doc. 25) is denied in part and granted in part. The motion is denied insofar as Plaintiff's ADEA and PHRA retaliation claims go forward under a cat's paw theory of recovery. The motion is granted in all other respects. An appropriate Order is filed simultaneously with this Memorandum.

Robert D. Mariani
United States District Judge

DATED: 1/16/19